166    PEOPLE ex rel. CARTMILL v. CITY OF ROCHESTER.

Fifth Department, March Term, 1887.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. MAGGIE CARTMILL and Others v. THE CITY OF ROCHESTER, Respondent.

*City ordinance forbidding noise in streets — when singing by members of the Salvation Army does not constitute a nuisance or violate such an ordinance — form of judgment for the penalty and of the execution to be issued upon it.*

The relators were convicted of violating a penal ordinance of the city of Rochester, which provided that no person shall make, aid, countenance, or assist in making, any noise, disturbance or improper diversion in any of the streets, public squares, lanes, alleys or other public places in the city of Rochester; nor shall any assemblage or crowd of persons collect in such streets, public squares, lanes or alleys, or on any of the bridges, to the annoyance or disturbance of any of the citizens or others, under a penalty of ten dollars for each offense. Upon the trial it appeared that on the occasion in question (a Sunday afternoon) seven members of what is known as the "Salvation Army," including the relators were walking in single file on the sidewalk on North avenue, towards and near their barracks. Three of them were singing the words of a religious song, and one of them was carrying a small flag. Their object was to draw into their barracks those who were on the streets and in the saloons in order to convert them and to persuade them to leave their evil ways.

There was no evidence tending to show that there was any disorderly crowd, or that there was anything indecent or immoral in the appearance or conduct of the relators, or in the words which they sang, or that any person was disturbed or annoyed by their singing.

*Held*, that the conduct of the relators did not constitute a nuisance, nor did it justify their conviction of a violation of the ordinance.

That the provision of the ordinance that no person should make any noise in the public streets was not to be construed literally, nor was it intended to interfere with individual liberty of action in any respect, except so far as might be necessary to preserve the public peace and order and to prevent public annoyance or disturbance.

That a procession in a public street is not necessarily a nuisance.

That the fact that the occurrence was on Sunday did not affect the question.

That it was not pertinent to inquire into the sentiments or purposes of the organization of which the relators were members, or the expediency or propriety of their practice, in a religious or moral point of view, so long as there was nothing in their conduct which was unlawful or which threatened some tangible public or private mischief.

Judgment was taken against the relators "for ten dollars or to be imprisoned in the Monroe County Penitentiary for twenty days."

*It seems*, that the court had no power to enter such a judgment; that, under the provisions of the city charter and the ordinances passed pursuant thereto, it

could only enter a judgment for the penalty, and that the execution to be issued thereon could only direct the imprisonment of the defendant in case no property of the defendant could be found out of which to make the amount of the judgment. (SMITH, P. J.)

CERTIORARI to review a judgment of the Police Court of the city of Rochester, convicting the relators of a violation of an ordinance of said city relating to nuisances.

*W. Henry Davis*, for the relators.

*Ivan Powers*, city attorney, for the respondent.

SMITH, P. J.:

The relators were convicted of violating a penal ordinance of the city of Rochester, relating to nuisances, by creating a noise and disturbance upon a public street of said city. The ordinance under which the conviction was had provides that no person shall make, aid, countenance or assist in making any noise, disturbance or improper diversion in any of the streets, public squares, lanes, alleys or other public places in the city of Rochester, nor shall any assemblage or crowd of persons collect in such streets, public squares, lanes or alleys, or on any of the bridges, to the annoyance or disturbance of any of the citizens, or others, under a penalty of ten dollars for each offense. The charter of the city (Laws 1880, chap. 14, § 40) confers upon the common council power to make such ordinances as it may deem desirable within said city, for the following purposes, among others, viz. (Sub. 1.): "To prevent vice and immorality, to preserve public peace and good order, to prevent and quell riots, disturbances and disorderly assemblages." (Sub. 16.) To regulate the ringing of bells and the crying of goods and other commodities for sale at auction, and otherwise, and to prevent disturbing noises in the street; and subdivision 5 of said section gives authority to "abate or remove nuisances of every kind."

The relators were members of what is known as the "Salvation Army." On the occasion in question (a Sunday afternoon) seven of the members of that organization, including the relators, were walking in single file on the sidewalk on North avenue, towards and near their barracks. Three of them were singing the words of what one of the witnesses termed a religious song, "We Will Walk

in the Light of God," and one of them was carrying a small flag. Their object, as some of them testified, was to draw into their barracks those who were on the streets and in the saloons, in order to convert them and to persuade them to leave their evil ways. While they were thus engaged, they were arrested by a person who was not shown to have held any official position that authorized him to make the arrest, and who admitted on the stand that he had no warrant. They were taken before the police justice, by whom they were tried. Larragy, the person who arrested them, testified that they were "acting in a disorderly manner," but it is obvious from his testimony that what he regarded as disorderly was that which he characterized by the double appellation of "singing and hallooing" on the streets, he not stating that there was any hallooing other than the singing. He did testify that he heard one of them say, "we will fight," but which of them said it he did not state. He also testified that there was "a crowd following them, any place from twenty-five to fifty, or one hundred to one hundred and fifty," a statement in which he was not corroborated by any other witness, while several of the witnesses for the defense testified that there were very few persons on the street before the arrest was made. If there was a crowd, there is no evidence that it was disorderly or that it disturbed anyone. There was no proof that there was anything indecent or immoral in the appearance or conduct of the relators, or in the words which they sang, nor that any person was disturbed or annoyed by their singing, unless it was the one who arrested them. It was not shown or claimed that there was any collision, tumult or disturbance of any kind before the arrest, except that one of the witnesses testified that the horse he was driving was disturbed by the flag, but to what extent, or how the disturbance was manifested by the animal, did not appear. It is apparent, therefore, from all the testimony, that the relators were simply marching upon the sidewalk, carrying a flag and singing, according to their custom, to induce those who happened to see or hear them to follow them to their barracks. And the question is presented, whether such conduct amounted to a nuisance within the meaning of the ordinance and the provisions of the charter above referred to.

The provision of the ordinance that no person shall make any

noise in the public streets is not to be construed literally. It was not intended to wrap the streets of a commercial city in unbroken silence, or to suppress or diminish the roar of travel and traffic with which they almost incessantly resound. Nor was it intended to interfere with individual liberty of action in any respect, except so far as may be necessary to preserve the public peace and order, and to prevent public annoyance or disturbance. If the ordinance in question goes beyond that limit it exceeds the authority given by the charter to the common council. The provisions of the charter, in pursuance of which the ordinance was enacted, are designed to prevent public disorder and disturbance. The same clause which gives power to the common council " to prevent disturbing noises in the streets," impliedly withholds the power to prevent " the ringing of bells and the crying of goods for sale at auction" in the streets by giving authority merely to "regulate" them. Unless the practice is permitted there is nothing to regulate.

A procession in a public street is not necessarily a nuisance. It can hardly be supposed that a political procession, like those which frequently march through the streets of our cities and villages, with banners and bands of music, in a presidential campaign, is within the purview of the provisions referred to. So of like military and civic demonstrations. But if such processions are lawful, wherein did the relators offend? Had they stopped and gathered a crowd, blocking the sidewalk an unreasonable length of time, and impeding the progress of passengers, doubtless their conduct would have amounted to a nuisance at common law. (*Rex* v. *Carlile*, 6 Carr. & P., 636.) Had they made any indecent or immoral demonstration, or used abusive or insulting language towards others, or sought a quarrel with passers-by, they might well have been held guilty of making a " disturbance or improper diversion " in a public street. But, as we understand the testimony, it does not appear that any·thing of that kind occurred. Their singing and display of the flag were simply the means they ordinarily used to attract attention and procure followers to their quarters, and we do not think the use of those means can be said, under the circumstances, to have amounted to a disturbance of the public peace, within the meaning of the ordinance and the charter. Like means used by showmen, exhibitors and vendors of wares, under ordinary circumstances, to attract

170  PEOPLE ex rel. CARTMILL v. CITY OF ROCHESTER.

FIFTH DEPARTMENT, MARCH TERM, 1887.

public attention, would hardly be regarded as infractions of the ordinance.

The fact that the occurrence was on Sunday, we think, does not affect the question. The ordinance is not a Sunday regulation. It applies to all days alike. As the conviction is under the ordinance alone, the only question is whether the acts of the relators were a violation of the ordinance, without reference to the day of the week on which they occurred. Nor, in our judgment, is it pertinent to inquire into the sentiments or purposes of the organization of which the relators are members, or the expediency or propriety of their practices, in a religious or moral point of view, so long as there is nothing in their conduct which is unlawful, or which threatens some tangible public or private mischief. At the same time, to use the words of a distinguished jurist, " we cannot accede to the suggestion that religious liberty includes the right to introduce and carry out every scheme or purpose which persons see fit to claim as part of their religious system. There is no legal authority to constrain belief, but no one can lawfully stretch his own liberty of action so as to interfere with that of his neighbors, or violate peace and good order. The whole criminal law might be practically superseded if, under pretext of liberty of conscience, the commission of crime is made a religious dogma. It is a fundamental condition of all liberty, and necessary to civil society, that all men must exercise their rights in harmony, and must yield to such restrictions as are necessary to produce that result. It is not competent to make any exceptions, either for or against the body of which petitioner is a member because of its theories concerning practical work. In law it has the same right, and is subject to the same restrictions in its public demonstrations as any secular body or society which uses similar means for drawing attention or creating interest." (Per CAMPBELL, C. J. [Mich. Sup. Ct.], *In the Matter of Frazee*, 6 Western Rep., 140.)

In one respect, it seems to us that the Police Court erred in a matter of procedure. The record states that the defendants were found guilty of violation of the ordinance, and judgment was taken against them " for ten dollars or be imprisoned in the Monroe County Penitentiary for twenty days." It further states that " judgment was suspended against Mrs. Grieve, and the other

PEOPLE ex rel. CARTMILL *v.* CITY OF ROCHESTER. 171

FIFTH DEPARTMENT, MARCH TERM, 1887.

defendants were sent to said penitentiary." It seems to us that the judgment, so far as it subjected the relators to imprisonment, was unauthorized. Our views upon this point are advanced with some hesitation, as the point has not been argued or suggested by counsel, and it is possible there is some provision in the charter or ordinances of the city, authorizing the judgment in that form, to which our attention has not been directed. But the case appears to us to stand thus : The charter provides that where, by its provisions, the common council have authority to pass ordinances on any subject, they may prescribe any penalty, not exceeding $150 (except when a penalty is therein otherwise provided for) for a violation thereof, and may provide that the offender, on failing to pay the penalty recovered, shall be imprisoned in the Monroe County Penitentiary or county jail, for any term, not exceeding 150 days, which penalties may be sued for and recovered, with costs, in the name of the City of Rochester. We are informed by the brief of the counsel for the respondent, that it is provided by the forty-second section of the ordinance under which the judgment was rendered, that every execution issued upon a judgment recovered for a violation of said ordinance, except as therein otherwise provided, shall command the amount to be made of the property of the defendant, if any such can be found, and if not, then to commit the defendant to the Monroe County Penitentiary for a period not exceeding twenty days. We have not been referred to, and are not aware of any other provision of the charter or of the ordinances bearing on the subject, with the exception of the first section of the same ordinance which imposes a penalty of ten dollars for each violation of said ordinance therein described. Under these provisions the only judgment authorized was for the penalty. The execution, issued on the judgment, was required to direct the imprisonment of the defendants, but only upon the condition that no property of the defendants could be found out of which to make the amount of the judgment. The judgment did not even follow the direction respecting the form of the execution, for it adjudged the penalty, *or* imprisonment in the alternative, and did not impose as a condition of the latter, that no property could be found. And for aught that appears, the defendants, except Mrs. Grieve, were sent to the penitentiary without any attempt having been made to find property.

As no appeal is provided by statute from a judgment of the Police Court, the proper remedy for a review of the determination of that court is by *certiorari.* (Code of Civil Pro., § 2120.)

For the reasons above stated the judgment should be reversed, with disbursements and fifty dollars costs to the relators.

Haight and Bradley, JJ., concurred; Barker, J., not voting.

Judgment reversed, with fifty dollars costs to relators, also disbursements to relators.